UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
THOMAS PETTI,                                    **NOT FOR PUBLICATION**

                          Plaintiff,            **MEMORANDUM & ORDER**
                                                 13-CV-267 (KAM)
-against-

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

                          Defendants.
-----------------------------------X

**MATSUMOTO**, **United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Thomas

Petti ("plaintiff") brings this action, appealing the final

decision of defendant Commissioner of Social Security

Carolyn Colvin ("defendant" or the "Commissioner").

Plaintiff suffers from knee impairment subsequent to a left

knee replacement surgery and alleges his disability onset

date was on January 19, 2010. Plaintiff appeals the

Commissioner's decision determining that plaintiff was not

disabled until his fiftieth birthday, December 16, 2010,

when plaintiff's age category changed pursuant to 20 C.F.R.

§ 404.1560(c) and 20 C.F.R. § 404.1566. (Tr. 21.) Presently

before the court are the parties' cross-motions for

judgment on the pleadings. For the reasons set forth below,

the court grants the Commissioner's motion for judgment on the pleadings and denies plaintiff's cross-motion for judgment on the pleadings.

BACKGROUND

I.  Personal History

Plaintiff was born on December 16, 1960. (Tr. 18.) He attended high school and one year of college. (Tr. 18, 119.) Plaintiff worked as a firefighter for the New York City Fire Department from July 17, 1994 until January 19, 2010. (Tr. 31, 119.) Plaintiff's job required him to respond to emergencies and fight fires. (Tr. 31.) His work primarily involved arduous physical activities such as carrying protective equipment and tools (weighing from fifty to over one hundred pounds), kneeling, climbing, crawling, and lifting people.  (Tr. 31, 120.)

Plaintiff lives in a house on Staten Island with his wife and three children. (Tr. 129.)

II.  Plaintiff's Medical History

A.  *December 12, 2007 Injury and Examinations*

On December 12, 2007, plaintiff tripped on debris, fell back, and injured his left knee while fighting a fire on a roof. (Tr. 124, 342.) Plaintiff experienced a burning

2

pain but continued to work. (Tr. 342.) By the time he returned to the firehouse, plaintiff experienced increasing pain, stiffness and swelling. (Tr. 342.) X-rays conducted that day found: small suprapatellar joint effusion; no acute fracture or dislocation; medial joint space narrowing and osteophyte formation consistent with osteoarthritis; small, well corticated round opacity projecting over the intercondylar fossa, which was likely an intra-articular loose body. (Tr. 292.)

On January 15, 2008, Dr. Jo A. Hannafin[1] at the Hospital for Special Surgery examined Mr. Petti. (Tr. 210.) Dr. Hannafin's described the ligamentous exam as "normal." (Tr. 210.) Dr. Hannafin found that Mr. Petti had no effusion and had tenderness to palpation over the mid and posteromedial joint line. (*Id.*) Plaintiff's McMurray test was positive with one click, and he had pain with flexion and rotation testing. (*Id.*) Additionally, Mr. Petti had a negative petellofemoral grind test and no crepitus with active or active-resisted extension of the knee. (*Id.*)

Dr. Hannafin also reviewed plaintiff's MRI dated

---

[1] Dr. Hannafin had previously treated plaintiff for an injury to his right shoulder. (Tr. 218.)

December 22, 2007. (*Id.*) She noted a complex tear involving the posterior horn and body of the medial meniscus. She also observed evidence of an osteochondral injury with some bony overgrowth that "did not appear acute" and a "low-grade" posterior cruciate ligament ("PCL") injury. (*Id.*) Dr. Hannafin stated that the osteochondral injury appeared chronic. (*Id.*) For treatment purposes, she recommended an arthroscopy and resection of the medial meniscus flap tear. (*Id.*)

On January 23, 2008, Dr. Hannafin performed surgery on plaintiff, specifically an arthroscopy and partial medial meniscectomy. (Tr. 333.) Both the preliminary and postoperative disagnoses were chronic osteochondral lesion, medial femoral condyle, and acute medial meniscus tear. (*Id.*)

On March 18, 2008, plaintiff presented to Dr. Hannafin for his second postoperative visit. (Tr. 209.) Plaintiff stated that he continued to have pain over the medial aspect of the left knee. (*Id.*) He also noted some anterolateral pain. (*Id.*) Dr. Hannafin's report recommended that Mr. Petti start physical therapy. (*Id.*) Dr. Hannafin also noted that Mr. Petti may continue to have some medial

pain, but that she anticipated that "this will continue to improve." (*Id.*)

On April 22, 2008, three months after his surgery, plaintiff attended another follow-up visit with Dr. Hannafin. (Tr. 208.) Dr. Hannafin reported that Mr. Petti's anterior pain had resolved, but continued to have deep posteromedial pain in his knee. (*Id.*)  Upon examination, she observed no palpable effusion, patellofemoral pain, nor pain with flexion/rotation testing. (*Id.*) She did note plaintiff was tender over the mid and posteromedial joint line. (*Id.*) Dr. Hannafin concluded plaintiff had chondral loss in the same area in which he had the partial meniscectomy. (*Id.*) She stated that the remainder of the meniscus looked healthy, and that she did not think Mr. Petti had re-torn his meniscus. (*Id.*)  She believed plaintiff's symptoms might be from cartilage loss. (*Id.*) During the visit, Dr. Hannafin administered intraarticular injections of lidocaine and Depo-Medrol to the plaintiff. (*Id.*)

Mr. Petti's follow-up visit on May 5, 2008 indicated that he had a good response to the previous injections and had begun to do some work hardening in preparation for

returning to work in full gear. (Tr. 207.) However, during a visit with Dr. Hannafin on May 14, 2008, Mr. Petti reported that he felt posteromedial pain and a mild pop when he tried to sprint across the street in the rain. (Tr. 206.) In another follow-up visit with Dr. Hannafin on June 3, 2008, a MRI from May 30, 2008 showed that the plaintiff had a subarticular stress fracture in the medial aspect of the weightbearing surface of the medial tibial plateau with reactive bone marrow edema on both the medial femoral and tibial plateau sides. (Tr. 205.)  For the next five months, Mr. Petti continued to report pain and was using an unloader brace. (Tr. 202-04.)

On November 6, 2008, Dr. Kerry J. Kelly, the Chief Medical Officer of the Medical Committee of the New York City Fire Department ("Medical Committee") issued a memo with recommendations to Nicholas Scoppetta, the Fire Commissioner regarding the Mr. Petti's injury and rehabilitation. (Tr. 327.)  The memo summarized Mr. Petti's treatment and rehabilitation since he sustained his injury. (*Id.*) Drs. Gasalberti, Maloney, and Marchisella of the Medical Committee also conducted an examination of Mr. Petti's left knee, which revealed some swelling and

increased tenderness to palpation of the anteromedial joint line. The Medical Committee then recommended that plaintiff was permanently unfit for firefighting duties. (*Id.*)

On November 18, 2008, plaintiff returned to Dr. Hannafin for another follow up. (Tr. 201.) Dr. Hannafin reported that Mr. Petti stated that he had no significant pain, just occasional soreness along the medial femoral condyle. (*Id.*) Plaintiff had no swelling, locking, buckling or giving way of his knee. (*Id.*) After a physical examination of plaintiff's left knee, Dr. Hannafin noted it was not tender over the tibia and along the joint line. (*Id.*) Plaintiff had mild tenderness over the medial femoral condyle, no pain with flexion rotation testing and no effusion. (*Id.*) Plaintiff had full range of motion. (*Id.*) After reviewing an X-ray of plaintiff's MRI, Dr. Hannafin noted advanced chondromalacia on the weight bearing surface of the medial femoral condyle which had remained unchanged. (*Id.*) She observed there was also a "striking increase" in the reactive bone marrow edema in the medial femoral condyle with resolution of the bone marrow edema in the medial tibial plateau. (*Id.*) She explained that the radiologist noted a near-complete

interval resolution of the previously noted subcortical stress fracture of the plateau without any collapse of the articular surface. (*Id.*) Dr. Hannafin reported that although it appeared the tibia had healed, plaintiff had begun to stress load the medial femoral condyle. (*Id.*) She decided to put plaintiff back in the unloader brace to try and resolve the stress in that area. (*Id.*) Dr. Hannafin then discussed the possibility of a high tibial osteotomy to unload his medial compartment and to try and save his remaining articular surface. (*Id.*) She also mentioned that plaintiff may have to switch jobs and end his career as a firefighter. (*Id.*)

On January 6, 2009, Mr. Petti attended his next follow-up visit with Dr. Hannafin. (Tr. 200.) He had recently taken a fitness test with the fire department and was only able to tolerate 2.5 minutes on the StairMaster because of knee pain. (*Id.*; Tr. 344.) Dr. Hannafin wrote that kneeling and squatting continued to cause Mr. Petti pain, particularly when getting out of a squat. (Tr. 200.) She noted, while plaintiff had tenderness over the medial tibial plateau, he no longer had tenderness over the medial femoral condyle and was not tender over the joint line.

(*Id.*) After examining plaintiff, her impression was that he had areas of acute bone edema, both on the tibial plateau and the femoral condyle. (*Id.*) She wrote that the most recent MRI demonstrated femoral condylar change with resolution of the tibial plateau changes. (*Id.*) She recommended a follow-up MRI to see if there had been resolution of the bone edema. (*Id.*) She explained that, at that point, if the bone edema was resolved, plaintiff's pain had to be attributed to his posttraumatic arthrosis in the medial compartment, which may be permanent. (*Id.*)

On January 6, 2009, Dr. Basil Dalavagas, a General Orthopedist at University Place Orthopaedics, evaluated Mr. Petti with respect to the potential disability of his left knee. (Tr. 345.) Upon examination, Dr. Dalavagas noted plaintiff ambulated with a slight limp in the left leg and ached with a full extension, particularly in the medial aspect of the knee. (Tr. 346.) He observed minimal effusion, no crepitus, and no anterior or posterior instability. (*Id.*) The McMurray test was negative. (*Id.*) Dr. Dalavagas observed plaintiff had an ache when squatting over 60° and when kneeling. (*Id.*) He reviewed the January 2008 operation report and MRIs. (*Id.*) Dr. Dalavagas then

issued his impression. (Tr. 347.) He wrote that plaintiff was one-year post arthroscopic surgery in the left knee for a partial medial menisectory and had developed a stress fracture in the medial tibia plateau, which was treated with an unloader brace. (*Id.*) He also wrote that Mr. Petti had an osteophyte formation in the medial femoral chondyle and a partial PCL tear with moderate functional deficit. (*Id.*) Dr. Dalavagas then concluded that he believed plaintiff was not permanently disabled for the performance of full fire duty. (*Id.*) He recommended that plaintiff should be reevaluated in six months and sent his findings to Dr. Francis A. Pflum, the Chairperson of the Subchapter 2 Medical Board of the Fire Department of the City of New York. (Tr. 345-47.)

On March 24, 2009, plaintiff returned to Dr. Hannafin for another follow-up. (Tr. 199.) During the visit, Dr. Hannafin observed plaintiff had tenderness to palpation with kneeling and squatting. (*Id.*) He had pain when he goes to approximately a 20-40° flexion arc. (*Id.*) She also reviewed plaintiff's latest MRI and noted a near complete resolution of the larger area of edema in the medial femoral condyle. (*Id.*) Dr. Hannafin's impression was that

plaintiff continued to have significant pain and limited range of motion and was not able to squat, crawl, or go up and down stairs. (*Id.*) She attributed this pain to the post-traumatic arthrosis in the medial compartment since the bone edema was resolved. (*Id.*) She noted this condition is permanent. (*Id.*) She concluded with her opinion that plaintiff was permanently disabled from his duties as a New York City firefighter due to post-traumatic arthrosis. (*Id.*) In a written summary of Mr. Petti's medical care dated April 9, 2009, Dr. Hannafin reiterated that plaintiff was permanently disabled from the New York City fire department. (Tr. 344.)

On October 19, 2009, Dr. Andrew D. Pearle, an Orthopedic Surgeon at the Hospital for Special Surgery, examined plaintiff. (Tr. 260.) Plaintiff articulated his continued problems with his left knee, including pain when he gets up from a seated position, significant standing pain, and "some pain" going up and down the stairs. (*Id.*) Dr. Pearle noted that the pain is localized to the medial aspect of the joint. (*Id.*) Mr. Petti reported having trouble with daily activities, but no significant night pain. (*Id.*) Dr. Pearle recommended plaintiff undergo a

unicondylar knee replacement. (Tr. 261.)

Dr. Dalavagas, who provided an opinion to the Medical Committee in January 2009, re-examined plaintiff on December 9, 2009. (Tr. 340.) Plaintiff informed Dr. Dalavagas of his plan to have a partial knee replacement in his left knee. (*Id.*) Upon examining plaintiff, Dr. Dalavagas found plaintiff able to ambulate with minimal ache and no limping in the left knee. (*Id.*) He did observe significant ache medially with squatting and marked tenderness to the medial joint line. (*Id.*) He also found a significant varus deformity in the left knee, and, upon review of plaintiff's X-rays, an irregular projection in the articular surface of the medial femoral condyle projecting into the medial joint line. (*Id.*) A review of plaintiff's MRI also showed significant findings of unilateral traumatic changes on the medial compartment of the left knee. (*Id.*) Dr. Dalavagas concluded that plaintiff was permanently disabled from full fire duty. (Tr. 341.)

B. *January 21, 2010 Knee Replacement Surgery and Recovery*

Plaintiff alleges an onset disability date of January 19, 2010. On January 21, 2010, Dr. Pearle performed a left knee unicondylar knee replacement surgery on plaintiff at

the Hospital for Special Surgery. (Tr. 222.) On the same day the Medical Board issued a recommendation to the Fire Commissioner that plaintiff be granted disability retirement. (Tr. 349.) The Medical Board relied on the reports of Dr. Pearle, Dr. Hannafin, and Dr. Dalavagas. (*Id*.) The Medical Board concluded that plaintiff's disability was "causally related to his activities in the Fire Department" and recommended that plaintiff be granted disability retirement. (*Id*.) The Medical Board also stated plaintiff may engage in "a suitable occupation." (*Id*.)

Following the surgery, Plaintiff's X-ray revealed an anatomic alignment of the postoperative left knee. (Tr. 267.) Plaintiff was discharged on January 23, 2010, at which point, he had progressed to managing stairs and walking with crutches. (Tr. 227.)

Plaintiff began postoperative physical therapy on January 29, 2010 at the Rehabilitation Physical Therapy Associates of Staten Island. (Tr. 253.) Plaintiff complained of knee pain both at rest and with movement. (*Id*.) On a scale from one to ten, he rated his pain at rest at three, and he rated his pain with movement at seven. (*Id*.) He described standing, movement and exercise made his

pain worse, and lying down made it better. (*Id.*) Plaintiff reported he was taking Oxycodone and Aspirin to manage his pain. (*Id.*) His initial physical therapy evaluation revealed plaintiff's range of left knee motion was 10 to 75 degrees and his muscle strength was two on a scale of one to five. (Tr. 254.) Plaintiff continued to attend physical therapy sessions through May 27, 2010. (Tr. 240-49.)

On February 2, 2010, Dr. Pearle examined plaintiff as a follow-up to his knee replacement surgery. (Tr. 262.) The doctor noted that plaintiff was "doing quite well." (*Id.*) The incision healed well, Mr. Petti's staples were removed, and he was able to achieve full extension. (*Id.*) Plaintiff's X-ray showed that the prosthesis was in a good position. (*Id.*)

On March 2, 2010, plaintiff had another follow-up examination with Dr. Pearle. (Tr. 263.) Dr. Pearle once again noted plaintiff was "doing quite well." (*Id.*) His exam showed full range of motion in his left knee, and his incisions were benign. (*Id.*)

On May 12, 2010, Dr. Perry Drucker, Chairman of the Department of Physical Medicine and Rehabilitation at Richmond University Medical Center, examined Mr. Petti for

the first time. (Tr. 285.) Plaintiff's reason for the visit
with Dr. Drucker was left knee pain. (*Id.*) He reported the
pain worsened with extended activity, such as when using
stairs and squatting. (*Id.*) Plaintiff's pain improved with
rest and medication. (*Id.*) Dr. Drucker's examination
revealed mild localized medial swelling. (Tr. 286.)
Plaintiff's left knee showed full range of motion. (*Id.*)
His patella demonstrated no crepitus. (*Id.*) His lateral
aspect was not tender on palpitation. (*Id.*) He had no
medial or lateral instability.(*Id.*) Dr. Drucker recommended
plaintiff perform exercises at home on a consistent basis
to maintain the knee's range of motion and strength. (Tr.
287.)

Plaintiff had a follow-up visit with Dr. Pearle on
June 2, 2010. (Tr. 264.) Plaintiff reported some
intermittent mild pain. (*Id.*) Dr. Pearle reported plaintiff
was doing well and had full range of motion of the knee and
no pain with the range of motion. (*Id.*) Plaintiff was
instructed to follow up with Dr. Pearle in another three
months. (*Id.*)

Plaintiff also attended a follow-up visit with Dr.
Drucker on July 7, 2010, in which Dr. Drucker again

recommended home exercises to help treat plaintiff's left knee pain. (Tr. 290.)

Plaintiff was next seen by Dr. Drucker on October 10, 2010. (Tr. 330.) Plaintiff again reported intermittent episodes of left knee buckling, moderate pain, and left knee medial aspect exacerbated with extended activities. (*Id.*) Plaintiff additionally reported intermittent difficulty rising from a seated position and moderate difficulty ascending and descending stairs. (*Id.*) Dr. Drucker's examination demonstrated moderate medial joint line tenderness with decreased muscle strength in the left quadriceps. (*Id.*) Plaintiff was instructed to attend physical therapy three times a week for six weeks. (*Id.*)

Plaintiff attended another follow-up visit with Dr. Drucker on November 15, 2010 after twelve sessions of physical therapy. (*Id.*) He continued to experience intermittent episodes of left knee buckling and pain in the medial aspect of the left knee. (*Id.*) Plaintiff did report a moderate improvement with his physical therapy intervention. (*Id.*) An examination of Mr. Petti demonstrated moderate medial joint line tenderness. (*Id.*) Plaintiff was instructed to continue with physical therapy,

but taper to one or two times a week. (*Id.*)

Plaintiff attended three more follow-up visits on January 5, 2011, February 16, 2011, and June 11, 2011. (Tr. 330.) Examinations at each visit demonstrated mild medial joint line tenderness. (Tr. 330-31.) Each time, plaintiff was instructed to continue with his home exercise regimen. (*Id.*) At his last visit on June 11, 2011, Mr. Petti reported significant exacerbation with squatting activities as well as increased pain with sitting greater than 30-45 minutes. (Tr. 331.)

On June 24, 2011, Dr. Drucker issued a narrative report, after Mr. Petti's symptomatology and physical examination were stabilized. (Tr. 329-332). Dr. Drucker also conducted a Patient Functional Assessment to do Sedentary Work on the same day. (Tr. 337.) Dr. Drucker assessed that Mr. Petti could stand or walk for less than 2 hours in an eight-hour day and could sit for less than 6 hours. (Tr. 331, 337.) Dr. Drucker noted that Mr. Petti reported that after prolonged sitting greater than 45 to 60 minutes, he experienced significant increased left knee symptomatology. (Tr. 331.) Dr. Drucker reported that, in his opinion, plaintiff could carry more than 5 pounds but

less than 10 pounds if required to do so for a total up to two-thirds of an eight-hour work day. (*Id*.) Dr. Drucker concluded that plaintiff was then "totally disabled" and "unable to partake in any significant gainful employment." (Tr. 332.) He stated plaintiff's condition, in his opinion, was permanent in nature, that plaintiff had functional limitations with respect to his standing/ambulation tolerance, and that the plaintiff reports moderate exacerbation of his left knee symptoms with prolonged sitting. (Tr. 332.)

III.  Procedural History

On June 11, 2010, plaintiff applied for disability insurance benefits. (Tr. 99-100). He alleged disability since January 19, 2010, due to a knee injury, partial meniscectomy, and partial knee replacement. (Tr. 99-100). On July 30, 2010, the Social Security Administration (SSA) denied plaintiff's claim, upon a determination that plaintiff was not disabled. (Tr. 45-48.) The explanation of determination stated that Mr. Pettis' condition was "not severe enough to keep [him] from working" based on his age, education, experience, and ability to "perform light work." (Tr. 48.)

On August 2, 2010, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to contest the SSA's determination of non-disability. (Tr. 53.) Plaintiff appeared, represented by counsel, before ALJ Wallace Tannenbaum on August 9, 2011. (Tr. 25-40.) Subsequently, on September 8, 2011, ALJ Tannenbaum issued a "partially favorable" decision, finding that plaintiff was disabled as of December 16, 2010, his fiftieth birthday, and thereafter, but not prior to December 16, 2010. (Tr. 11-21.) ALJ Tannenbaum found Mr. Petti had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (Tr. 17.) He found that there was no "objective medical evidence which points to an inability to sit for long periods" and therefore declined to give Dr. Drucker's residual functional capacity assessment from June 2011 controlling weight. (Tr. 19.) ALJ Tannenbaum found that since January 19, 2010, Mr. Petti was unable to perform his past relevant work as a firefighter. (Tr. 20.) The ALJ also found that prior to December, 16, 2010, there were jobs in the national economy that Mr. Petti, at age 49, could have performed. (Tr. 20.) Beginning on December 16, 2010 when Mr. Petti turned 50,

plaintiff's age category changed, and ALJ Tannenbaum found that plaintiff was disabled by direct application of Medical-Vocational Rule 201.14. (Tr. 20-21.)

Plaintiff filed a timely request for review on October 27, 2011. (Tr. 167.) On November 30, 2012, the Appeals Counsel denied plaintiff's request for review. (Tr. 1-5.) The Appeals Counsel stated they "found no reason under our rules to review the [ALJ's] decision." (Tr. 1.) ALJ Tannenbaum's decision became the final decision of the Commissioner. (*Id.*)

On January 13, 2013, plaintiff commenced the instant action. (ECF No. 1, Complaint dated 1/13/2013 ("Compl.").) On July 1, 2013, the government moved for judgment on the pleadings, and plaintiff cross-moved for the same on July 30, 2013. (ECF No. 14, Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings dated 7/1/2013, ECF No. 16; Memorandum of Law in Opposition to the Commissioner's Motion and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings dated 7/30/2013.)

DISCUSSION

I.   <u>Standard of Review</u>

In reviewing the ALJ's decision to deny Social Security disability benefits, the court does not determine *de novo* whether plaintiff is disabled, but sets aside the ALJ's decision only where it is based on legal error or is not supported by substantial evidence in considering the record as a whole. *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). The reviewing court, in determining whether findings are supported by substantial evidence, "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review" of the records. *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

Unlike a trial judge, the ALJ "must . . . affirmatively develop the record in light of the essentially

non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)(internal citations and quotation marks omitted); *see also* 20 C.R.C. § 702.338. The ALJ's obligation to develop the administrative record exists even when "the claimant is represented by counsel" at the hearing. *Pratts*, 94 F.3d at 37; *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Nevertheless, where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

II.  Legal Standards for Disability Claims

> *A. The Commissioner's Five-Step Analysis of Disability Claims*

In order to receive disability benefits, a claimant must become disabled while he still meets the insured status requirements of the Social Security Act and the regulations promulgated by the SSA. *Arone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). "Disability" is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a "five-step sequential evaluation" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Perez v. Chater*, 77 F.3d 41, 46 (2d. Cir. 1996)(describing the five-step process). If the Commissioner can determine that a claimant is disabled or not disabled at any step of the five-step sequence, the evaluation stops at that step and the Commissioner issues his decision; if a determination cannot be made at steps 1 through 4, the sequence continues to the fifth step. 20 C.F.R. § 404.1520(a)(4).

At Step 1, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful employment, he is not disabled "regardless of [his] medical condition." 20 C.F.R. § 404.1520(b). Otherwise, the Commissioner moves to step 2, and determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. §

404.1520(a)(4)(ii).

If the claimant's impairment is in fact medically severe, the sequence continues to step 3, in which the Commissioner compares the claimant's impairment to a listing of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. § 404.1520(a)(4)(iii). If the claimant's impairment "meets or equals" one of the listed impairments, she is *per se* disabled irrespective of her "age, education, and work experience," and the sequential evaluation stops. 20 C.F.R. § 404.1520(d).

If the claimant is not *per se* disabled under step 3, the Commissioner must determine the claimant's residual functional capacity ("RFC") before continuing to step 4. 20 C.F.R. § 404.1520(e). RFC is defined as the most the claimant can do in a work setting despite the limitations imposed by his impairment. 20 C.F.R. § 404.1545(a)(1). In determining the claimant's RFC, the Commissioner should consider "all of the relevant medical evidence," as well as descriptions and observations by non-medical sources, such as the claimant's friends and family. 20 C.F.R. § 404.1545(a)(3).

After making his RFC determination, the Commissioner

will proceed to step 4, at which point the Commissioner must determine whether the claimant's RFC is sufficient to perform his "past relevant work," which is defined as substantial gainful activity that the claimant has done within the past fifteen years. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b)(1). If the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). Otherwise, the Commissioner must determine at step 5 whether the claimant can make "an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

In making his determination under step 5, the Commissioner must use his prior RFC finding in conjunction with the claimant's "vocational factors" (*i.e.*, age, education, and work experience) to determine whether the claimant can transition to another job that is prevalent in the national economy. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c)(1). The Commissioner has a limited burden under step 5 to provide "evidence that demonstrates that other work exists in significant numbers in the national economy that" the claimant can do in light of his RFC and vocational factors. C.F.R. § 404.1560(c)(2). If the

claimant cannot transition to another job prevalent in the national economy, the Commissioner must find the claimant disabled. *See* 20 C.F.R. § 404.1520(g)(1).

B. *The Treating Physician Rule*

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotation marks omitted). Nonetheless, the claimant's treating physician's opinion regarding the nature and severity of the claimant's impairment should be given controlling weight "so long as it is well-supported by medically acceptable . . . diagnostic techniques and it not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128; *see also* 20 C.F.R. § 404.1527(d)(2). Treating physicians are afforded controlling weight because they are more likely to be "able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical findings alone" or from individual examinations. 20 C.F.R. § 404.1527(d)(2).

When the ALJ declines to give controlling weight to the treating physician's opinion in the disability decision,

the ALJ must give "good reasons" for the weight assigned to the treating physician's opinion. 20 C.F.R. § 404.1527(b)(2). The ALJ shall consider six regulatory factors in determining how much weight to ultimately assign the treating physician's opinion:

> (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability [i.e., the degree of explanation given in the opinion]; (4) consistency [with the record as a whole]; (5) specialization; (6) other factors such as the treating physician's familiarity with disability programs and with the case record.

20 C.F.R. § 404.1527(d)(2)(i)-(ii); § 404.1527(d)(3)-(6).

C. *Assessing Plaintiff's Credibility*

When the claimant purports to experience symptoms such as pain, the ALJ must consider "the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)(internal citation and quotation marks omitted). The ALJ follows a two-step process to evaluate a claimant's testimony regarding symptoms such as pain. 20 C.F.R. §§ 404.1529(b), 416.929(b). First, the ALJ must consider whether the claimant has a medically-determinable

impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant. *Id.* This requirement "stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability." *Genier*, 606 F.3d at 49 (emphasis in original). Second, if the claimant makes statements about symptoms that are not supported by medical evidence, then the ALJ must make a finding as to the claimant's credibility. *See Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009). In assessing the claimant's credibility, the ALJ must consider all objective medical evidence as well as various regulatory factors including the claimant's daily activities, the nature of the pain, the effectiveness of any medication taken, and other measures the claimant uses to relieve pain.[2] If the ALJ finds that the witness is not

---

[2]     The full list of factors as provided by 20 C.F.R § 404.1529(c)(3)includes:
        (i) Your daily activities;
        (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
        (iii) Precipitating and aggravating factors;
        (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
        (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
        (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your

credible, the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).

## II. Application

On September 8, 2011, the ALJ issued his "partially-favorable" decision based on his review of the record pursuant to the SSA's five-step sequential evaluation analysis for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a). Under step one, the ALJ found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 17.) Under step two, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 17.) Under step three, the ALJ found that since the alleged onset date, January 19, 2010, the claimant's knee impairment constituted a "severe impairment." (Tr. 17.) Under step four, the ALJ found that since that since the alleged onset date of disability,

_____

back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

January 19, 2010, the claimant did not have an impairment
or combination of impairments that meets or medically
equals the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §
404.1520(d), 404.1525, and 404.1526. (Tr. 17.)

Under step five, the ALJ found that, after
consideration of the entire record, the claimant had RFC to
perform the full range of sedentary work as defined in 20
C.F.R. 404.1567(a), and declined to give the Dr. Drucker's
RFC opinion given in June 2011 controlling weight. (Tr. 17,
19.) ALJ Tannenbaum considered that Drs. Hannafin and
Dalavagas found that Mr. Petti was fully disabled from
performing the full duties of a firefighter, but the
doctors never cited limitations which would preclude him
from doing other less strenuous work. (Tr. 19.) ALJ
Tannenbaum noted that although Dr. Drucker's assessment
dated June 24, 2011 found that Mr. Petti had exertional
limitations which prevented even the performance of
sedentary work, this assessment was inconsistent with the
medical record as a whole. (*Id.*) In particular, the ALJ
noted that Dr. Drucker's "detailed" report from July 2010
only mentions intermittent episodes of left knee buckling

and pain which slowly worsened with extended activity and was increased with climbing stairs and with squatting. (*Id.*) The ALJ also noted that in plaintiff's original disability statement, Mr. Petti stated that he was using a stationary bike and that in his July 5, 2010 statement, Mr. Petti indicated that he experienced most of his pain and swelling when performing physical activities and when having to stand on his feet for prolonged periods of time. (*Id.*)

Plaintiff asserts that the ALJ's refusal to give controlling weight to the medical opinion of Dr. Drucker is improper. (Pl.'s Br. at p. 9-13.) Upon the court's review of the entire record, it concludes that the ALJ's decision is supported by substantial evidence. First, Dr. Drucker was one of Mr. Petti's three treating physicians. *See* 20 C.F.R. § 404.1502.[3]  Drs. Hannafin and Pearle also had an

___

[3] "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be

ongoing treatment relationship with Mr. Petti and thus constitute treating physicians under federal regulations. *See id.* Therefore, ALJ Tannenbaum appropriately weighed Dr. Hannafin's reports which stated that Mr. Petti could not squat, crawl, and go up and down stairs, but did not state any limitations with respect to Mr. Petti's ability to sit. *See Cosnyka v. Colvin*, 586 Fed. Appx. 43, 45-46 (2d Cir. 2014)(noting that earlier physical examinations that "included no mention of significant trouble walking or sitting" showed that the treating physician's opinion was "inconsistent with other medical evidence in the record").

Dr. Pearle, who operated on Mr. Petti and replaced his knee in January 2010, also continued to examine Mr. Petti until at least June 2010 and mentioned no problems or complaints while Mr. Petti was sedentary. Two days after plaintiff's alleged disability onset date of January 19, 2010, Dr. Pearle performed left knee replacement surgery. Plaintiff's post-operative reports after his January 23, 2010 post-surgical discharge indicated that as of February

---

your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source." 20 C.F.R. § 404.1502.

2, 2010, plaintiff was doing "quite well" and achieved full extension. (Tr. 262.) In March 2010, plaintiff continued to do "quite well" and have full range of motion in his left knee. (Tr. 263.) In May 2010, plaintiff reported pain in his left knee with extended activity when using the stairs or squatting (Tr. 285.), but plaintiff's left knee had full range of motion, no crepitus, no tenderness and no instability. (*Id.*) In June 2010, plaintiff reported intermittent pain, but he had full range of motion of his left knee without pain. (Tr. 264.) In July 2010, Dr. Drucker recommended at home exercises to treat plaintiff's left knee pain. Between October 2010 and November 15, 2010, plaintiff reported intermittent knee buckling and moderate pain with extended activities and was recommended for physical therapy which brought moderate improvement by November 15, 2010. In January, February, and June 2011, plaintiff's follow-up visits reported mild joint tenderness, and he was advised to continue home exercises. (Tr. 330-31.) During his June 2011 visit with Dr. Drucker, plaintiff reported that squatting exacerbated his pain and increased pain when sitting more than 30-45 minutes. (Tr. 331.)

ALJ Tannenbaum accorded more weight to Dr. Drucker's

detailed assessment from July 2010, where Dr. Drucker reported isolated episodes of knee buckling and that Mr. Petti's pain worsened with extended activity such as using the stairs and squatting but failed to mention any problems when the plaintiff was sedentary, as more consistent with the "medical record as a whole." (Tr. 19.) That all six of Dr. Drucker's prior assessments from May 2010 to February 2011 included no mention of any limitations when sitting goes to the weight of his June 24, 2011 assessment, in which he reported that plaintiff could sit less than six hours in an eight hour day, with significant increases of left knee symptomology after sitting more than 45-60 minutes. (Tr.  331-337.) "[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Here, ALJ Tannenbaum appropriately declined to give substantial weight to Dr. Drucker's June 24, 2011 opinion. The ALJ pointed to substantial evidence in the record from other physicians, Dr. Drucker's own reports, and the plaintiff's statements that were inconsistent with

Dr. Drucker's June 2011 patient functional assessment.

Plaintiff also argues that the ALJ's credibility finding is not supported by substantial evidence. (Pl. Br. at 14.) Pursuant to 20 C.F.R. § 404.1529(c)(3), however, the ALJ highlighted plaintiff's daily activities and precipitating and aggravating factors in support of his finding. (Tr. 19.) The ALJ noted that Mr. Petti stated in his original disability statement that he "was using a stationary bike" and that in his July 5, 2010 supplemental statement, Mr. Petti averred that he "experienced most of his main and swelling when performing physical activities, and when having to stand on his feet for prolonged periods of time." (*Id.*) The ALJ properly cited these inconsistencies as weighing against the plaintiff's credibility. *See Snyder v. Barnhart*, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004)(finding an ALJ's analysis proper where it cited inconsistency between plaintiff's testimony and the record as evidence of plaintiff exaggerating symptomatic limitations).

The record corroborates the ALJ's finding that plaintiff's testimony regarding his pain and limitations was not fully credible. That Mr. Petti only uses over-the-

counter pain medication to alleviate his knee pain also
supports the ALJ's credibility determination regarding
plaintiff's statements of pain.  (Tr. 120, 138, 138, 158.);
*see Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir.
2008)(finding the "fact that a patient takes only over-the-
counter medicine to alleviate her pain" may be used to help
support the Commissioner's conclusion that the claimant is
not disabled).  Plaintiff also reported that he was able to
do some light housework while refraining from handling
heavy objects (Tr. 132), has no problems following
instructions, paying attention, and completing tasks (Tr.
135), and is able to drive.  (Tr. 29, 35, 132.)  After
examining the full record, the court finds no reason
disturb the ALJ's credibility finding.

Plaintiff also argues that the ALJ failed to
adequately develop the record and to provide "good reasons"
for rejecting Dr. Drucker's June 24, 2011 opinion.  The
court agrees that when there is a gap in the record, "an
ALJ must seek out clarifying information from physicians
whose opinions the ALJ discounts."  *Oliphant v. Astrue*, No.
11-cv-2431, 2012 WL 3541820, at *20 (E.D.N.Y. Aug. 14,
2012)(Matsuomoto, J.).  However, here, ALJ Tannenbaum

considered a complete medical record without clear or obvious gaps. Therefore, the ALJ was not required to seek out additional information and could ascribe limited weight to Dr. Drucker's June 24, 2011 opinion based on the fact that functional limitations were absent from the Drs. Hannafin and Dalavagas' reports and Dr. Drucker's reports prior to June 2011. *See Alachouzos v. Commissioner,* No. 11-cv-1643, 2012 WL 601428, at *6 (E.D.N.Y. Feb. 23, 2012)(rejecting argument that "if the treating physician's conclusions are unsupported by medical evidence, then the ALJ's duty to complete the record entails going out and developing more evidence until there is a basis for the treating physician's conclusions"). Furthermore, the ALJ's detailed decision pointed to substantial evidence in the record, as discussed above, which constituted sufficient "good reasons" for giving limited weight to Dr. Drucker's June 24, 2011 opinion.

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion for judgment on the pleadings and denies plaintiff's cross-motion for judgment on the pleadings. The Clerk is respectfully requested to enter judgment in favor

of defendant and close the case.


SO ORDERED.


Dated:     December 2, 2014
           Brooklyn, New York


                          _____/s/_____
                          Kiyo A. Matsumoto
                          United States District Judge